UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 7 Case |
| PALI HOLDINGS, INC., | Case No. 10-11727 (REG) |
| Debtor. |  |
| YANN GERON, Chapter 7 Trustee of the Estate of Pali Holdings, Inc., |  |
| Plaintiff, | Adversary Proceeding |
| against | Case No. 11-02912 (REG) |
| DAVID PEEBLER, |  |
| Defendant. |  |

DECISION ON MOTION FOR SUMMARY JUDGMENT

A P P E A R A N C E S:

FOX ROTHSCHILD LLP
*Counsel for Plaintiff Yann Geron,*
  *Chapter 7 Trustee*
100 Park Avenue, 15th Floor
New York, New York 10017
By:   John Wait, Esq.
      Oksana Wright, Esq. (argued)

JONES & ASSOCIATES
*Counsel for Defendant David Peebler*
1230 6th Avenue 7th Floor
New York, New York 10020
By:   Roland Gary Jones, Esq.

LAW OFFICE OF IRA R. ABEL
*Co-Counsel for Defendant David Peebler*
520 Eighth Avenue, Suite 2001
New York, NY 10018
By:   Ira R. Abel, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 7 case of Debtor Pali Holdings, Inc., plaintiff Yann Geron, the chapter 7 Trustee (the "**Trustee**"), seeks turnover, under section 542 of the Bankruptcy Code, of the proceeds of a promissory note (the "**Note**") defendant David Peebler executed in favor of Pali Holdings. Peebler's defenses to payment on the Note are frivolous. Peebler's only contention that even warrants a written opinion[1] is his contention that a bankruptcy judge lacks the constitutional power to issue a final judgment for the requested relief.

For the reasons that follow, the Court confirms its earlier oral ruling that when, as here, a trustee's turnover rights under section 542 of the Code are appropriately invoked (*e.g.* to secure the return of property of the estate, or to monetize it), bankruptcy judges plainly have the constitutional power to issue final judgments for turnover. On the merits, the Court confirms its oral ruling that there here are no material disputed issues of fact, and that Peebler has no defenses under the Note.

Facts

*1. The Loan*

Beginning in January 2004, defendant Peebler was a full-time employee of the Debtor's affiliate, Pali Capital, Inc. Peebler was employed as a trader at Pali's Global Derivatives Desk.

In June 2007, in connection with a share purchase plan Debtor Pali Holdings, Inc. ("**Pali**") offered to certain employees, Peebler borrowed $105,000 (the "**Loan**") from Pali. Peebler signed the Note in exchange for the money he borrowed. The Note obligated Peebler to

---

[1] This decision memorializes and amplifies upon the decision issued orally from the bench at the conclusion of oral argument.

-1-

repay the $105,000 principal amount of the Loan, plus interest at 8% per annum, in monthly installments of $700 commencing June 30, 2007.

Peebler then used the Loan amount to purchase shares in Pali. In connection with his purchase, Peebler executed a subscription agreement (the "**Subscription Agreement**") under which he agreed to purchase 4,000 shares. Peebler also executed a pledge agreement (the "**Pledge Agreement**") under which he granted Pali a security interest in the shares he purchased.

Each of the Subscription Agreement, the Pledge Agreement and the Note also provided, expressly, that Pali would have recourse against both the shares purchased under the Subscription Agreement and borrower Peebler personally, for full satisfaction of his obligations under the Note. The Subscription Agreement stated, at the end of its first page and running on to the second:

> The undersigned understands and agrees that the Shares shall be collateral under the Pledge Agreement, that upon an Event of Default (as defined in the Pledge Agreement), the Company *shall have recourse* to the Shares *and to the undersigned* for full satisfaction of the undersigned's obligations with respect to payment of the unpaid portion of such balance, together with accrued and unpaid interest, *and that the Company shall be entitled to initiate a claim of any nature against the undersigned,* regarding payment of such obligations hereunder.[2]

Likewise, the Pledge Agreement provided:

> **Full Recourse.**  Without limiting the applicability of any provision herein, Pledgor assumes full liability for the payment of the Obligations.[3]

Likewise the Note provided:

---

[2]  Subscription Agreement at 1-2 (emphasis added).

[3]  Pledge Agreement ¶ 8 (bold face and underlining in original).

-2-

> **Full Recourse.**  Without limiting the applicability of the foregoing Section 2, Borrower assumes full liability for the payment of the Obligations (as defined in the Pledge Agreement).[4]

Peebler contends that notwithstanding the unambiguous language of each of those three documents, he was "led to believe" that the Loan was without recourse to his personal assets, and that the estate's recovery was limited to the security for the Loan.  But he offers no evidentiary support for that contention—not even telling the Court the source of that understanding.

Additionally, Peebler executed a shareholders' agreement (the "**Shareholders' Agreement**") which provided, among other things, that if any court proceeding were brought in connection with the Shareholders' Agreement, the prevailing party "shall be entitled to recover from the other party all costs, expenses and reasonable and verifiable attorneys' fees incidental to any such proceeding."[5]  But the Shareholders' Agreement (whose subject matter was principally Pali's rights with respect to Peebler's conduct and shares after he purchased them, including in connection with a desire by Peebler to transfer the shares, or his death, disability, insolvency, divorce or termination of employment) did not incorporate into it Peebler's duty to pay on the Note.  And neither the Subscription Agreement, the Pledge Agreement nor (most significantly) the Note had a comparable attorneys fees provision.

2. *Peebler's "Bonus" or "Commission"*

During the time at which Peebler was employed at Pali, derivatives traders at Pali were compensated in various forms in addition to a base salary.  According to Richard Anthony, (former Head of Global Derivatives at Pali), in addition to base salary, derivatives traders were "entitled to commissions," which were collected into a "bonus pool" to be distributed to

---

[4]     Note at ¶ 3 (bold face and underlining in original).

[5]     Shareholders' Agreement at ¶ 11.

derivatives traders.[6]  Also according to Anthony, as head of the derivatives desk he had sole authority to decide the amount of each person's bonus based on his or her performance.[7]  In an affidavit provided in connection with this litigation, Anthony stated that he *intended* to "give David Peebler $169,000.00 as his share in the 'bonus pool'" but that this amount was never paid to Peebler because of Anthony's resignation from his position at Pali on December 10, 2009.[8]

Importantly, Peebler provided no evidence that Anthony communicated this intention to anyone at Pali, or that Anthony otherwise acted on his stated intention.  Nor did Peebler introduce any evidence showing that Anthony or Pali promised him anything by way of bonus or commission.

*3. Peebler's Resignation; Pali's Bankruptcy Filing*

On December 15, 2009, Peebler resigned from Pali.  On April 1, 2010, Pali filed a voluntary chapter 11 petition in this Court.  About six months later, upon a motion of the Debtor, the case was converted to chapter 7.  By letter dated October 11, 2011, the Trustee demanded that Peebler pay the amount due under the Loan.  But Peebler failed to do so.

*4. Attorneys Fees*

After summary judgment was granted, the Trustee submitted evidence of his legal fees in collecting on the Note.  The amount shown was reasonable.  But the Trustee did not offer any evidence of a contractual entitlement to fees except under the Shareholders' Agreement.

---

[6]     Anthony Aff. ¶ 4.

[7]     Anthony Aff. ¶ 5; *see also* Belton Dep. at 47-48.

[8]     Anthony Aff. ¶ 10.

Discussion

I.

The Merits

*A. Summary Judgment Standards*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[10] Then, if the movant carries this initial burden, the non-moving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[11]

In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[12] A fact is material if it "might affect

---

[9] FED. R. CIV. P. 56(a), made applicable to this adversary proceeding by FED. R. BANKR. P. 7056; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Court notes that Rule 56 was amended in December 2010. By order of the Supreme Court, the amendment governs "insofar as just and practicable, [in] all proceedings . . . pending." Supreme Court Order of April 28, 2010. The amended Rule applies to this motion, but the Court also notes that the substantive standard for summary judgment has not been altered. Advisory Committee Notes to December 2010 Amendment to Rule 56 ("The standard for granting summary judgment remains unchanged.").

[10] *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact . . . .").

[11] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr. S.D.N.Y. 2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

[12] *See Matsushita*, 475 U.S. at 587 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) ("We . . . constru[e] the evidence in the light most favorable to the non-moving party.").

the outcome of the suit under the governing law."[13]  An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[14]

*B. Application to Facts Here*

The Trustee contends that the Note was full recourse, as the three documents Peebler signed provided, and that there are no other defenses to payment.  This aspect of the Trustee's motion requires minimal discussion.

"Cases seeking recovery on promissory notes are particularly suitable for disposition via summary judgment, as the moving party need merely establish the absence of a genuine issue as to execution and default."[15]  After a prima facie case for judgment on the note is made, the burden shifts to the non-moving party to present competent evidence establishing a genuine issue for trial.[16]

Here it is undisputed that payment under the Note was due, and that Peebler has not repaid it.  But he attempts to defeat summary judgment by raising, as asserted genuine issues for trial, defenses that (1) he believed the Note to be non-recourse; and (2) that he was entitled to bonus compensation which would offset amounts due under the Note.  Neither is a satisfactory defense here.

The first contention is frivolous.  Documents that Peebler signed provided in three separate places that his duty to pay on the Note was full recourse to him personally.  In fact, two of them—the Note and the Pledge Agreement—said that in bold face.  The third—the

---

[13]     *See Anderson*, 477 U.S. at 248, 1 S.Ct. 2505.

[14]     *Id*.

[15]     *Pereira v. Cogan*, 267 B.R. 500, 506 (S.D.N.Y. 2001) (Sweet, J.) ("***Cogan***").

[16]     *Id*. at 506-07.

Subscription Agreement—said that again, and went on to say that Pali (in whose shoes the Trustee now stands) would have the right to initiate a claim of any nature against him.

The Court does not need to decide whether the parol evidence rule would here apply in the absence of express integration clauses. There here is no basis in the record for Peebler's contention that there was *any* agreement to the contrary, much less that documents he signed should be nugatory because of his wholly unsupported assertion that he was "led to believe" otherwise. Particularly in light of the lack of any evidence to the contrary, the Court must hold that Peebler was bound by the terms of the three documents' plain language.

Peebler's second contention, that he was entitled to unpaid bonus compensation which would offset the amounts owed under the Note, is likewise insufficient to defeat summary judgment. Offset (sometimes alternatively referred to as "setoff") claims do not bar summary judgment on promissory notes unless the offset claims and the payment obligations under any such notes are contractually "dependent" promises.[17] "Unrelated offset claims may be relevant only at the point when the Court considers whether to render final and enforceable a previously granted summary judgment."[18] And here there is insufficient evidence to find *any* rights on Peebler's part to unpaid bonus compensation, much less to find obligations that were dependent.

---

[17] *Id*. at 507. Peebler asserts that two later cases, *Pereira v. Nelson (In re Trace Int'l Holdings, Inc.)*, 284 B.R. 32, 39-40 (Bankr. S.D.N.Y. 2002) (Bernstein, C.J.) and *Cohen v. Elephant Wireless, Inc.*, 2004 U.S. Dist. LEXIS 16583, at *10-13, 2004 WL 1872421, at *3-4 (S.D.N.Y. Aug. 13, 2004) (Motley, J.), hold that "the doctrine of setoff may apply even if the debt or credit arises from different transactions than the contract being sued upon." Peebler Br. at ¶¶ 56-57. Of course that is true. But that is not determinative of whether a motion for summary judgment on a promissory note can be defeated. Under Fed.R.Civ.P. 54(b), applicable in this adversary proceeding under Fed.R.Bankr.P. 7054(a), the Court would take the potential existence of a valid setoff claim into account before entry of a final, enforceable, judgment on the Note if any evidence had been established to establish a right of setoff, but here there is none.

[18] *Cogan*, 267 B.R. at 507.

Peebler has provided no evidence showing that the obligations were dependent. To the contrary, all of the evidence provided to the Court shows that the obligation under the Note and any obligation to pay Peebler bonus compensation arose at different times—in 2007 and 2009, respectively—and for different reasons. The obligations to pay under the Note as it was drafted are unconditional, saying nothing about a right to offset future compensation or bonus payments against the obligations due under the Note.[19]

Nonetheless, the Court would likely defer granting entry of the judgment authorizing collection on the Note (even one issued on a motion for summary judgment) if there were any evidence of a duty on Pali's part to pay Peebler any potentially offsetting amounts. But Peebler has failed to put forward any evidence of unpaid obligations to him. Anthony's vague testimony that he *intended* to allocate certain amounts to Peebler is unaccompanied by any evidence that Anthony followed through on that intention, or that he or anyone else made a legally binding promise. At the same time, the affidavits of Trustee witnesses that no sums were due to Peebler when he left Pali were uncontroverted.

Because the Trustee made the necessary prima facie showing, and Peebler made no showing whatever to controvert it, summary judgment on the Note must be granted in favor of the Trustee.[20]

---

[19] Peebler points to language in the Note which states "Unless the Holder is instructed in writing otherwise, interest payments, when and as due, under this Note will be deducted from compensation due Maker from Holder or its affiliate, and any shortfall shall be paid by Maker separately." Note at ¶ 1.1. But the Court fails to see the basis upon which Peebler properly can rely upon this language. It effectively gives rise to a setoff option with respect to interest (though interest alone) of which the Maker can avail himself (if any "compensation [is] due Maker"). But here there has been no proof of any "compensation due Maker." And even then, the Note says nothing to make obligations on Note repayment and on bonus payments dependent on each other.

[20] However, the Trustee has not shown a like entitlement to his attorneys fees in collecting on the Note, even though those fees were satisfactorily proven and reasonable. As discussed above, attorneys fees were authorized under the Shareholders' Agreement. But there were no comparable attorneys fees provisions in the Note, Pledge Agreement, or Subscription Agreement. The Shareholders' Agreement provided for

-8-

II.

Final Judgment from a Bankruptcy Judge

Apart from the merits, Peebler has raised additional contentions. In his memorandum in opposition to summary judgment, Peebler's lead counsel argued that "[a]lternatively, the Bankruptcy Court should abstain from making a final judgment in this adversary proceeding and grant the defendant additional time to file a motion to withdraw the reference."[21] Peebler's "appearance counsel"[22] then made a variant of that argument at the hearing on the Trustee's summary judgment motion, raising as an additional defense an argument that a bankruptcy judge lacks the power, as a constitutional matter, to issue a final judgment in a turnover proceeding.

The Court finds no merit in either contention.

*A. Request for Abstention Pending Motion for Withdrawal of Reference*

The first contention requires little in the way of discussion. Since *Stern v. Marshall*[23] was decided, district and bankruptcy courts here and across the country have been assaulted with a deluge of motions, and expressions of desire to file motions, to withdraw the reference, premised on arguments that a bankruptcy judge lacks the constitutional authority to enter a final

---

    attorneys fees if any court proceeding were brought in connection with it, but the rights the Trustee here is seeking to enforce arose under the Note instead. The Trustee's entitlement here does not in any way arise from covenants under the Shareholders' Agreement, which addressed Pali's rights with respect to Peebler's conduct and shares after he purchased them, including in connection with a desire by Peebler to transfer the shares, or his death, disability, insolvency, divorce or termination of employment.

[21]    Peebler Br. at ¶ 21.

[22]    The second of Peebler's two lawyers here identified himself in correspondence to the Court as "appearance counsel for Jones and Associates…." *See* ECF #20 (endorsed order on letter by appearance counsel seeking dispensation for late filing of papers by Jones & Associates). This is an example of an increasingly common practice in this Court, particularly on relief from stay motions and simpler avoidance actions, for a law firm to arrange for substitute counsel to appear in court in its place. Because "appearance counsel," even one identifying himself or herself as "of counsel" to a law firm, necessarily must actually be counsel for the original firm's *client* and not the original firm, "appearance counsel" here is simply listed as co-counsel for Peebler in the "Appearances" at the outset of this decision.

[23]    131 S.Ct. 2594 (2011) ("*Stern*").

order or judgment in that proceeding.[24] Though such motions, after they are filed, are decided by district judges, bankruptcy judges are repeatedly asked, as here, to defer proceedings pending those motions' filing and determination.[25]

In some, but much less than all, of the instances in which such motions are made or threatened, the bankruptcy judge does indeed lack the constitutional power to issue a final order or judgment. But even when a motion to withdraw the reference might otherwise have merit, it should be filed promptly when the perceived basis for seeking such relief is apparent—and certainly not when briefing on a summary judgment motion has already begun.

There is no good reason for a litigant to ask the court to "abstain" pending a motion for withdrawal of the reference so late in the game. On this motion to "abstain"—the granting of which is discretionary with the Court—any one of the combination of (1) Peebler's gamesmanship here, (2) the disruption to the Court's calendar that would otherwise result, and (3) the default rule under Fed.R.Bankr.P. 5011 that proceedings are not stayed unless the bankruptcy judge orders otherwise would cause the Court to decline to "abstain" here. Here all three of those factors appear in combination, and that conclusion is even easier.

*B. Constitutional Authority to Enter a Final Judgment*

More fundamentally, however, the Court disagrees with Peebler's second contention—that a bankruptcy judge lacks the constitutional power to enter a final judgment in this adversary

---

[24] As another judge of this Court has aptly observed, in a matter differing in its procedural context but reflecting the same reality, *Stern* "has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court." *In re Ambac Financial Group, Inc.*, 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011) (Chapman, J.) ("***Ambac***").

[25] That is so even though Fed.R.Bankr.P. 5011, which governs motions to withdraw the reference, provides that unless the bankruptcy judge orders otherwise, the filing of a motion to withdraw the reference does not stay the proceeding or case. *See* Fed.R.Bankr.P. 5011(c).

-10-

proceeding.[26] A turnover proceeding like this one is a paradigmatic exercise of the Court's *in rem* jurisdiction, very different from the scenarios considered in *Marathon*[27] and *Stern*.

The statute under which the Trustee seeks turnover, section 542 of the Bankruptcy Code, provides, in relevant part, with exceptions not relevant here:

> (a) … [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
>
> (b) … [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee….[28]

Subsection (a) provides a remedy closely similar to a right of replevin—a right to recover the estate's property in kind—though with a right of recovery of the value of that property as a substitute. Subsection (b) provides what is in substance a mechanism for monetizing a debt that

---

[26] Understandably, Peebler does not contend that the bankruptcy court lacks subject matter jurisdiction here. It plainly exists. Under 28 U.S.C. § 1334(b), district (and hence bankruptcy) courts have subject matter jurisdiction in civil proceedings "arising under" title 11 (*i.e.*, the Bankruptcy Code), and "arising in" and "related to" cases under title 11. Here, the Trustee's turnover claims, which arise under section 542 of the Code; which are to recover property of an estate that would not exist but for Pali Holdings' chapter 11 (and now chapter 7) case; and which would monetize estate property for the benefit of its creditors, satisfy all three requirements. *Stern*, which affects the constitutional power of a bankruptcy judge to issue a final judgment in a matter as to which the bankruptcy court already has subject matter jurisdiction, does not in any way deprive bankruptcy courts of subject matter jurisdiction. *See, e.g., Stern*, 131 S.Ct. at 2607 ("Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. See §§ 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction.").

[27] *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87 (1982) ("*Marathon*").

[28] Section 542(b) goes on to provide an exception, where "such debt may be offset under section 553 of this title against a claim against the debtor." That would require honoring any right of setoff Peebler might have here if one existed. But as discussed above, he failed to show an entitlement to any setoff.

-11-

is property of the estate.  Each, importantly, provides a means for the estate to secure the benefits of property that *already* is property of the estate.[29]

A turnover action is expressly listed in 28 U.S.C. § 157(a)(2) as one of several kinds of "core proceedings"[30]—matters that, even after *Marathon*, Congress perceived to be "core" bankruptcy functions within the traditional purview of bankruptcy judges—and with respect to which, accordingly, bankruptcy judges could still enter final orders.[31]  After *Stern*, it now is clear that whether a matter is "core" as a statutory matter is not dispositive of the bankruptcy judge's power, as a constitutional matter, to issue a final judgment in it.[32]  But the reported post-*Stern* decisions have overwhelmingly held that bankruptcy judges can constitutionally enter final judgments in turnover actions.[33]  And Peebler cites no case to the contrary.[34]

---

[29]  Of course, neither provision provides a means for suing to bring *new property* into the estate.  When section 542 is used in that fashion, many courts, including two in this district, have held such a use to be an improper invocation of section 542 as a statutory construction matter, to be beyond the constitutional power of a bankruptcy judge to issue a final judgment, or both.  *See* nn. 33 and 39 below.

[30]  *See* 28 U.S.C. § 157(b)(2)(E) (Core proceedings include, but are not limited to "orders to turn over property of the estate.").

[31]  Peebler is incorrect in several respects when he contends (Peebler Br. at ¶ 62) that "this adversary proceeding is based on a non-core, common law claim by the Plaintiff."  First, of course, a turnover action like this one is *expressly listed* a core matter.  Second, while the same claim no doubt could *also* be asserted under common law, it here is asserted as a right under federal statutory law, section 542 of the Bankruptcy Code, 11 U.S.C. § 542.

[32]  *See Stern*, 131 S.Ct. at 2608 ("Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not.").

[33]  *See Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541 (B.A.P. 8th Cir. 2012) (speaking through Kressel, C.J.) (concluding that bankruptcy judge could issue a final judgment in a turnover proceeding; noting that "the Supreme Court itself has cautioned that its holding is a narrow one, affecting only … one small part of the bankruptcy judges' authority.  Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. §157(b)(2) is constitutional"); *In re Crescent Resources, LLC,* 457 B.R. 506, 510 & n.2 (Bankr. W.D. Tex. 2011) (Gargotta, J.) (concluding that bankruptcy court could issue a final judgment in a turnover matter, explaining that *Stern* dealt with issues different than those in the turnover matter before him, and likewise concluding that *Stern* should be applied narrowly); *In re McCrory*, 2011 Bankr. LEXIS 3403, at *2, 2011 WL 4005455, at *1 (Bankr. N.D. Ohio Sept. 8, 2011) ("***McCrory***") (Whipple, J.) (A turnover proceeding was one "that 'stems from the bankruptcy itself' that is within this court's jurisdiction to decide.") (*quoting Stern,* 131 S.Ct. at 2618); *In re Hernandez*, 468 B.R. 396, 401 n.4 (Bankr. S.D. Cal. 2012) (Mann, J.) ("***Hernandez***") (court had constitutional authority in a turnover proceeding based, among other things, on fact that it stemmed from the bankruptcy itself, quoting

-12-

The many cases recognizing the power of bankruptcy judges constitutionally to enter final judgments in turnover actions—repeatedly observing that turnover actions "stem[] from the

---

*McCrory* and *Stern*); *Rentas v. Claudio (In re Garcia),* 471 B.R. 324, 330 (Bankr. D.P.R. 2012) (Lamoutte, J.) ("***Garcia***") ("a turnover action is a fundamental bankruptcy matter that 'stems from the bankruptcy itself' and 'would necessarily be resolved in the claims allowance process' because it intricately hinges on the proper constitution of the bankruptcy estate," and noting that as ruled in *Braunstein v. McCabe,* 571 F.3d 108, 122 (1st Cir. 2009) ("***Braunstein***"), a turnover proceeding "invokes the [bankruptcy] court's most basic equitable powers to gather and manage the property of the estate") (internal quotations omitted; typographical error corrected); *Shaia v. Taylor (In re Connelly),* 476 B.R. 223, 231-34 (Bankr. E.D. Va. 2012) (Huennekens, J.) (bankruptcy court had statutory and constitutional power to enter a final judgment in a turnover proceeding where the trustee was attempting to enforce a promissory note in the Trustee's possession that was payable to bearer, because, among other things, it affected claims allowance process); *Burns v. Dennis (In re Southeastern Materials, Inc.*), 467 B.R. 337, 357 (Bankr. M.D. N.C. 2012) (Waldrep, J.) ("***Southeastern Materials***") (court had constitutional power to enter a final judgment in section 542 action against corporate officers, who had filed claims against the estate, for recovery on loans debtor had made to them, not just because they had filed claims and turnover right would necessarily be resolved in claims allowance process, but also because it stemmed from bankruptcy itself. "Both prongs of the *Stern* test have been met."); *see also In re Miller,* 2011 Bankr. LEXIS 3240, at *1, 2011 WL 3741846, at *1 (Bankr. N.D. Ohio Aug. 24 2011) (Morgenstern-Clarren, J.) (concluding that court had both statutory and constitutional authority to issue a final judgment in a turnover proceeding, but in opinion not intended for print or electronic publication, not expanding on reasons).

Recognizing the principle, but distinguishing the case before it on the facts, is *In re Fairfield Sentry Ltd,* 458 B.R. 665, 683, 687 (S.D.N.Y. 2011) (Preska, C.J.) ("***Fairfield Sentry***") (explaining that an action for turnover of property would be core (and an action in which a bankruptcy judge could constitutionally enter a final judgment) only when its purpose was the *collection* of a matured debt, as contrasted to an action where the property to be recovered was the subject of a significant dispute—and finding that action there invoked "classic common law claims for money had and received or mistaken payment").

The one outlier, *Moyer v. Koloseik (In re Sutton),* 470 B.R. 462 (Bankr. W.D. Mich. 2012) ("***Moyer***"), though without citation to any of the preceding cases, or the *in rem* character of turnover actions, concluded that a bankruptcy judge lacked the constitutional authority to enter even a default money judgment to recover on open accounts, reasoning that such was equivalent to a *Marathon*-style contract action. In promissory note cases like this one (and even open accounts cases when the debts clearly exist and are matured, which is what section 542 requires), this Court cannot agree. This Court chooses instead to go with the otherwise unanimous decisions to the contrary, and declines to follow *Moyer*, for the reasons stated in those other decisions and this one.

34    *See* Peebler Br. at ¶¶ 59-62. The single case Peebler cites for his contention, *Claybrook v. Les Schwab Tires Centers of Oregon, Inc. (In re American Remanufacturers, Inc*.), 2008 Bankr. LEXIS 2417, 2008 WL 4489771 (Bankr. D. Del. Sept. 30, 2008) (Walsh, J.) ("***Claybrook***"), did not in any way address the extent to which bankruptcy judges could constitutionally issue final judgments in section 542 turnover actions after *Stern*. In fact, *Claybrook* preceded *Stern* by almost three years. Rather, *Claybrook* involved a determination of whether the claims in that adversary proceeding were core or non-core—ultimately concluding that they were non-core. Though "turnover of estate property" was the name given to one of the four claims asserted (the others being for breach of contract, unjust enrichment and quantum meruit), the *Claybrook* court contrasted the case before it to one invoking a substantive right created by federal bankruptcy law, and noted that "[i]t is without dispute that this is essentially a contract dispute which could be addressed outside the bankruptcy arena."

-13-

bankruptcy itself"[35]—are easy to understand when one considers the conceptual underpinnings of a turnover action. It has long been established, and confirmed by the United States Supreme Court in two decisions in the last decade, that "[b]ankruptcy jurisdiction, at its core, is *in rem*."[36] "A bankruptcy court's *in rem* jurisdiction permits it to 'determin[e] all claims that anyone … has to the property or thing in question.'"[37]

A turnover action "invokes the court's most basic equitable powers to gather and manage property of the estate."[38] One of the most important functions of any trustee is to marshal the existing assets of an estate for the benefit of the estate's creditors. Turnover actions provide an important means by which that is done. A turnover action's essence is in bringing the estate's property into its custody—or in the promissory note and accounts receivable collection actions for which turnover also may be invoked as a statutory matter, in converting a note or account receivable that already is property of the estate into cash. A note receivable, like any other asset that undisputedly belongs to the debtor, properly may appear on a debtor's balance sheet, being replaced by a corresponding asset entry for cash when the note is paid off.

When the turnover power is properly invoked,[39] it is simply an effort to recover property—or *on* property—that is *already* property of the estate. That, in turn, invokes the court's *in rem* jurisdiction over the bankruptcy *res*.

---

[35]    *See McCrory*, 2011 Bankr. LEXIS 3403, at *2, 2011 WL 4005455 at *1; *Hernandez*, 468 B.R. at 401 n.4; *Garcia*, 471 B.R. at 330; *Southeastern Materials*, 467 B.R. at 357.

[36]    *Central Virginia Community College v. Katz*, 546 U.S. 356, 362 (2006); *accord Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) ("**Hood**").

[37]    *Hood*, 541 U.S. at 448 (quoting 16 *Moore's Federal Practice* § 108.70[1] (3d ed. 2004)).

[38]    *Braunstein*, 571 F.3d at 122.

[39]    Of course, the turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable. It is well established that the turnover power may not be used for such purposes. *See, e.g., Fairfield Sentry,* 458 B.R. at 683 ("Numerous courts have therefore held that an action

-14-

Though the summary jurisdiction that bankruptcy courts had under the 1898 Bankruptcy Act may not be dispositive of modern bankruptcy courts' *in rem* jurisdiction, it is instructive.[40]

Under the 1898 Act, as Klee explains:

---

is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action. … These actions are subject to significant dispute, resolution of which will determine whether the funds redeemed *are in fact property of the Funds' estates*.") (citations and internal quotations omitted; emphasis added); *Savage v. Mandl (In re Teligent)*, 325 B.R. 134, 137-38 (Bankr. S.D.N.Y. 2005) (Bernstein, C.J.) ("***Teligent***") (citing "settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute"; other law holding that an action to determine the amount of a claimed debt to the estate that is, as yet, wholly disputed and unliquidated cannot properly be styled an action to turn over estate "property"; and other law holding that an action should be regarded as a turnover "only when there is no legitimate dispute over what is owed to the debtor") (citations omitted); *Shea & Gould v. Red Apple Companies, Inc. (In re Shea & Gould)*, 198 B.R. 861, 867 (Bankr. S.D.N.Y. 1996) (Garrity, J.) (issuing report and recommendation, instead of final judgment, in debtor's action to recover fees for legal services rendered to the debtor, where court was doubtful that claim was sufficiently "specific in its terms as to amount due and date payable," and observing that "[a] turnover action may be inappropriate where the debtor's claim lacks such certainty").

Judge Bernstein recognized in *Teligent* that exercising jurisdiction over an improperly brought turnover action could eviscerate the Supreme Court's holding in *Marathon* by allowing the bankruptcy court to exercise judicial power reserved for Article III courts. 325 B.R. at 138. Thus, that the turnover power be properly invoked is integral to the bankruptcy court's ability to constitutionally exercise its *in rem* jurisdiction in entering a final judgment.

[40] If a matter was within the summary jurisdiction of a referee under the former Bankruptcy Act, which was quintessentially an *in rem* statute, that is a strong indication that it is within the power of a bankruptcy judge to enter a final order under the present Bankruptcy and Judicial Codes. As Kenneth Klee observes (in the first edition of a work written before *Stern*, when "core" matters and matters within the constitutional power of bankruptcy judges to enter final orders were generally perceived to be substantially congruent):

> Although the core/noncore distinction is not identical with the jurisdictional scheme under the Bankruptcy Act of 1898, the older jurisdictional decisions retain some vitality in shaping the contours of jurisdiction under the 1978 Bankruptcy Code. To be sure, the list of core proceedings in section 157(b)(2) of the Judicial Code is broader than summary jurisdiction conferred under the Act. It is doubtful, however, that the [Supreme] Court would find a matter that it formerly included within summary jurisdiction to be outside the scope of core proceedings. Thus, knowledge of the Act precedents may prove persuasive in resolving future jurisdictional disputes, even though not binding under the jurisdictional scheme of the Bankruptcy Code.

Kenneth N. Klee, *Bankruptcy and the Supreme Court* 215 (LexisNexis 2008) ("***Klee***"). However, that is not to say that the opposite is necessarily true. If a matter was not then within the summary jurisdiction, it may still be within the power of a bankruptcy judge to issue a final judgment, at least in instances where the bankruptcy judge is enforcing a right arising under title 11. The matter here, however, is simply an unusually easy one.

-15-

> If the debtor had actual or constructive possession of an asset that was property of the bankruptcy estate, the bankruptcy court could exercise summary jurisdiction because the *res* was *in custodia legis*; that is, based on the court's custody over the asset in the possession of the estate, the court could exercise pervasive *in rem* jurisdiction.[41]

Thus, under the 1898 Act, bankruptcy referees could exercise summary jurisdiction over turnover actions in instances where any adverse claim to that property was not bona fide.[42] And they had the power in the first instance to determine whether they had jurisdiction to proceed, and to examine (as this Court has examined here) whether the defense was bona fide.[43]

As Judge Chapman observed in *Ambac*, *Stern* "has nothing to do with the Court's in rem jurisdiction to administer property of the estate."[44] Where, as here, there are no serious defenses to the estate's section 542 turnover rights, a bankruptcy judge can exercise the bankruptcy court's *in rem* jurisdiction to issue a final judgment for the turnover of the estate's property, or to

---

[41]   *Klee* at 210.

[42]   Under the 1898 Act, if the property was not in the court's possession and a third person asserted a bona fide claim adverse to the trustee, the third party had the right to have the merits of his claim adjudicated in a plenary lawsuit. *See Cline v. Kaplan (In re Gold Medal Laundries, Inc.),* 323 U.S. 97, 98 (1944) ("**Cline**"). But "the mere assertion of an adverse claim [would] not oust a court of bankruptcy of its jurisdiction." *Id.* at 99. Rather, the bankruptcy court had "both the power and the duty to examine a claim adverse to the bankrupt estate to the extent of ascertaining whether the claim is ingenuous and substantial." *Id.* Only once it was established that the claim was not colorable nor frivolous did the claimant have the right to have the merits of his claim passed on in a plenary suit and not summarily. *Id.* at 99; *accord Harrison v. Chamberlin*, 271 U.S. 191, 194 (1926) ("**Harrison**").

[43]   *See Harrison*, 271 U.S. at 194. As the Supreme Court held in *Harrison*:

> However, the court is not ousted of its jurisdiction by the mere assertion of an adverse claim; but, *having the power in the first instance to determine whether it has jurisdiction to proceed, the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial* or merely colorable. And *if found to be merely colorable the court may then proceed to adjudicate the merits summarily;* but if found to be real and substantial it must decline to determine the merits and dismiss the summary proceeding.

*Id.* (emphasis added). Here Peebler's defenses are frivolous, and under the 1898 Act could have been considered, and rejected, summarily.

[44]   457 B.R. at 308.

-16-

monetize it.  Just as bankruptcy courts under the 1898 Act could exercise summary jurisdiction over turnover claims when the defenses to such claims were not "real and substantial,"[45] they can do the equivalent of that now.  Whatever constitutional limits might exist with respect to bringing *new* property into the estate (such as in actions at common law on contracts), those limits cannot be said to exist with respect to recovering property—or *on* property—that is already there.

## Conclusion

Summary judgment on the Note is granted in favor of the Trustee, and a final judgment will be entered in the Trustee's favor.  Pursuant to Fed.R.Civ.P. 58, made applicable to this adversary proceeding under Fed.R.Bankr.P. 7058, the Trustee is to settle, on no less than two business days' notice by hand, fax or email (or 14 calendar days' notice if the Trustee elects to use traditional mail), two documents:

>    (1) an order granting summary judgment in the Trustee's favor, and
>
>    (2) a standalone[46] judgment for the amount due, including prepetition and postpetition interest claimed, but not including the Trustee's attorneys fees in attempting to recover on the Note.

The Trustee is to accompany any request for interest with a letter, served with the Notice of Settlement and posted on ECF, explaining the contractual, legal and mathematical bases for the interest claimed.

Consistent with Fed.R.Civ.P. 62(a), as made applicable to this adversary proceeding under Fed.R.Civ.P. 7062, the judgment is to provide, expressly, that no execution may issue on

---

[45]    *Harrison*, 271 U.S. at 194.

[46]    *See* 10 *Collier* ¶ 7058.03.

the judgment, nor may proceedings be taken to enforce it, until 14 days have passed after its

entry.[47]

Dated: New York, New York  
      March 25, 2013

*s/Robert E. Gerber*  
United States Bankruptcy Judge

---

[47] This will provide defendant Peebler the opportunity to post a supersedeas bond, if he is of a mind to do so. But the Court will not grant a stay of enforcement of the resulting judgment in the absence of the posting of a supersedeas bond. If defendant Peebler wishes to seek a stay pending appeal without posting a bond, he may, and should, seek that from the district court.